# Exhibit F

AP 027

PROPOSED CHARGING LETTER


May [   ], 2011


David Parkes
Company Secretary
BAE Systems plc
6 Carlton Gardens
London SW1Y 5AD
United Kingdom

      Re:   Investigation of BAE Systems plc Regarding Violations of the
              Arms Export Control Act and the International Traffic in Arms
              Regulations

Dear Mr. Parkes:

      The Department of State ("Department") charges BAE Systems plc
including its businesses, units, subsidiaries (other than BAE Systems, Inc.
and its subsidiaries) and operating divisions ("Respondent") with violations
of the Arms Export Control Act ("AECA") (22 U.S.C. §§ 2778-2780) and
the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Parts
120-130) in connection with the unauthorized brokering of U.S. defense
articles and services, failure to register as a broker, failure to file annual
broker reports, causing unauthorized brokering, failure to report the payment
of fees or commissions associated with defense transactions, and the failure
to maintain records involving ITAR-controlled transactions.  A total of two
thousand five hundred and ninety-one (2,591) violations are alleged at this
time.

      This proposed charging letter and the facts set out herein do not relate
to or represent any AECA and ITAR violations of BAE Systems, Inc., and
its subsidiaries.

- 2 -

The essential facts constituting the alleged violations are described herein.  The Department reserves the right to amend this proposed charging letter, including through a revision to incorporate additional charges stemming from the same misconduct of Respondent in these matters.  Please be advised that this proposed charging letter, pursuant to 22 C.F.R. § 128.3, provides notice of our intent to impose debarment or civil penalties or both in accordance with 22 C.F.R. §§ 127.7 and 127.10.

When determining the charges to pursue, the Department considered mitigating factors, including the change in Respondent's senior management and members of the Board of Directors, and remedial compliance measures implemented after 2007.

At the same time, the Department considered aggravating factors in determining what charges to pursue, including the Respondent's failure to cooperate fully for the reasons described below in the fourteen months from the inception of the Department's investigation; its incomplete responses to the Department's requests for information; and its failure to maintain or produce relevant records.  These various facts were substantially responsible for the incomplete nature of the investigation, and the inability of the Department to assess fully the potential harm to U.S. national security.

The Department considered other aggravating factors, including the frequency and type of Respondent's violations; the fact that certain violations were authorized by its former most senior management of Respondent; that violations were systemic, wide-spread, and sustained for more than ten (10) years; only three (3) of the violations by the Respondent were disclosed at the request of the Department, not voluntarily, after Respondent's criminal plea with the U.S. Department of Justice; and all other remaining violations were never disclosed, but rather identified by the Department during its investigation.

We note that had the Department not taken into consideration Respondent's change in senior management and remedial compliance measures, the penalties imposed upon Respondent would likely have been more significant.

- 3 -

## BACKGROUND

Respondent is a multinational, integrated defense company headquartered in Farnborough, United Kingdom, with offices and operations in various countries around the world, including the United States. Respondent is the world's second largest defense company in terms of sales, employing approximately 105,000 people, with customers in over 100 countries. It manufactures, exports, brokers, and provides services regarding a host of land, sea and air defense systems and subsystems.

## SUMMARY OF INVESTIGATION

This section provides a summary of the Department's investigation into Respondent's ITAR-controlled activities and highlights the key findings.

In February 2010, the Department and Respondent communicated on Respondent's intent to enter into a plea agreement with the U.S. Department of Justice for one count of conspiracy to violate certain U.S. laws, including the Arms Export Control Act. The plea agreement was finalized and judgment was filed in the case on March 2, 2010 (together with the associated Criminal Information and Sentencing Memorandum, the "Plea Agreement").

Following a request from the Department on March 10, 2010, Respondent disclosed its failure to report (or causing the failure to report) certain payments that were subject to Part 130 of the ITAR.

The undisclosed payments, which began in the latter part of the 1990s and terminated in 2007,[1] were associated with the lease and lease/sale of JAS-39 "Gripen" aircraft to the Ministries of Defense, Czech Republic and Hungary, respectively. The Gripen aircraft contained U.S. origin defense articles. U.S defense services were provided to modify the aircraft for major U.S. systems and sub-systems. The aircraft were the subject of written re-export approval by the Department. Respondent has acknowledged that the payments were more than $100,000 and the Department has confirmed that the payments were in respect to Department licenses or other authorizations

---

[1] Respondent did not produce accurate records to confirm the specific dates that payments were made.

- 4 -

valued at more than $500,000.  The undisclosed payments with respect to Department licenses or other authorizations therefore constituted violations of the ITAR.

Immediately following the entry of judgment in the criminal case, the Department implemented an administrative hold on all new license applications or other requests that included Respondent and its foreign subsidiaries, with certain exceptions authorized by the Assistant Secretary for Political-Military Affairs.  Respondent's U.S. subsidiary, BAE Systems, Inc., and its U.S. subsidiaries, were not included in the administrative hold, except to the extent the license applications or other requests included Respondent as a party.  Based on information received from the U.S. Department of Justice, the Department concluded that BAE Systems, Inc., and its U.S. subsidiaries were not involved in the undisclosed payments.

From March through August 2010, Respondent and the Department engaged in various correspondence and meetings to ascertain the nature of the violations and other possible violations of the ITAR.

Throughout the Department's investigation, Respondent was incapable or reluctant to provide further, meaningful detail on its payment of fees or commissions associated with ITAR-controlled transactions.  Respondent indicated that it was constrained from responding due to UK statutes, including the Official Secrets Act of 1989 and the Data Protection Act of 1998; representations from the Government of the UK; and advice from the UK Serious Fraud Office (SFO), proffered during the time period when Respondent was subject of a separate criminal investigation by the SFO, that any internal inquiry conducted by the Respondent would be inappropriate.[2]

In November 2010, Department officials visited certain facilities of Respondent in the United Kingdom in an effort to understand Respondent's ITAR compliance program.  Respondent cooperated during the visit by explaining its current compliance program and provided substantial documentation on the implementation of that program.  As a result of that visit, the Department concluded that Respondent had a limited, but insufficient ITAR compliance program before 2007, which lacked adequate oversight, resources and record-keeping to fulfill their obligations under the ITAR.  Over the past three years, however, Respondent has made

---

[2] The SFO investigation concluded and its decision was accepted by the UK court on December 22, 2010.

substantive improvements to the program and has indicated that it will continue to do so.  Respondent has provided transparency on its current compliance program and future compliance objectives.

As a consequence of Respondent's lack of cooperation and other constraints on providing details of past ITAR-controlled activities, the Department was unable to complete a full review of Respondent's ITAR violations.  Relying on Department license and registration records, the limited information provided by Respondent, and certain information from the criminal investigation conducted by the U.S. Department of Justice, the Department has produced a reasoned approximation of the nature and type of violations by the Respondent.

<u>VIOLATIONS</u>

This section provides a summary of all known or estimated violations committed by Respondent.  Respondent was involved in the following types of ITAR violations:  unauthorized brokering of U.S. defense articles and services; causing unauthorized brokering; failure to register as a broker; failure to file annual broker reports; failure to report the payment of fees or commissions associated with defense transactions; and the failure to maintain records involving ITAR-controlled transactions.

*Unauthorized Brokering (1997-Present)*

Part 129 of the ITAR provides that a foreign person otherwise subject to the jurisdiction of the United States who engages in the business of brokering activities must register with the Department.  This requirement was implemented in 1997.  In the intervening fourteen years, Respondent has never been registered as a broker with the Department and, as detailed below, should have been registered.[3]

Pursuant to Part 129 of the ITAR, the Department requires that any foreign person otherwise subject to the jurisdiction of the United States who engages in brokering activities obtain a license or other written approval for

---

[3] Respondent's subsidiaries, BAE Systems, Inc., (U.S.), BAE Systems Australia, Ltd., and BAE Systems (Vehicles and Equipment) Ltd., England and Wales are registered as brokers with the Department.

the brokering activities, unless otherwise exempt under regulation.  The Respondent has never obtained written approval to engage in brokering activities.  The Department acknowledges that some number of licenses and other approvals have been granted to U.S. applicants that included Respondent as a foreign consignee that would otherwise authorize brokering activities for those particular U.S. defense articles.

Pursuant to section 129.9 of the ITAR, registered brokers are required to provide to the Department an annual report of brokering activities.  Respondent, not having been registered as a broker with the Department, has never provided an annual report of brokering activities for the years in which it should have provided a report, 1998-2010.

In 1995, Respondent formed a joint venture with SAAB AB, Sweden by the name of SAAB-BAE Systems Gripen AB.[4]  The primary purpose of the joint venture was to leverage Respondent's expertise in marketing and selling aircraft and providing after-sale services for the JAS-39 Gripen aircraft.  Subsequently in 2002, Respondent and SAAB AB formed Gripen International KB for similar reasons.  Respondent's subsidiary, BAE Systems (Operations) Ltd., and SAAB AB served for a time as the contracting and payment vehicles for Gripen International KB.  In 2005, SAAB AB assumed the marketing responsibility for new campaigns from Respondent, although Respondent continued from 2005 to support marketing efforts in relation to South Africa, the Czech Republic, and Hungary only, and remains a full partner in the joint venture.

From 1995-2004, eight (8) written requests (also known as General Correspondence requests) were approved by the Department for SAAB AB to market JAS-39 Gripen aircraft, which incorporated U.S. defense articles. U.S. defense services were provided to modify the aircraft for major U.S. systems and sub-systems.[5]  The countries and years approved were: Hungary 1995, Poland and Czech Republic 1996, Chile and Philippines 1997, Brazil and South Africa 1998, and Thailand 2004.[6]  Respondent also

---

[4] Saab AB and its subsidiaries are not the subject of any investigation related to the transactions described herein.
[5] Depending upon the country, aircraft configurations included:  SA11 fly-by-wire, RM12 turbofan engine, HUD, APU, AGM-65 Maverick ASM, AIM-9 Sidewinder AAM, AIM-120 AMRAAM
[6] Besides successful lease/sale agreement with Hungary (2004) and lease agreement with Czech Republic (2004), sales agreements occurred with South Africa (2001) and Thailand (2009).

- 7 -

engaged in brokering activities in all eight (8) countries during this period, but did not submit any requests for approval.

From 1998-present, Respondent exported the "Hawk" Trainer aircraft to the following six (6) countries:  Indonesia 1999, Australia and Canada 2000, Bahrain and South Africa 2006, and India 2007.  The aircraft incorporated U.S. defense articles.  U.S. defense services were provided to modify the aircraft for major U.S. systems or sub-systems.[7]  Respondent did not obtain U.S. approval to engage in brokering activities of the U.S. systems or sub-systems as part of the proposed aircraft sale for any of the countries.

From 1998-present, Respondent marketed or exported the EF-2000 Eurofighter "Typhoon" to the following thirteen (13) countries:  Australia, Czech Republic, Greece, Netherlands, Norway, Poland, Saudi Arabia, Singapore, and South Korea 1999, Austria 2001, Denmark 2005, Japan 2006, and Switzerland 2008.  The aircraft incorporated U.S. defense articles.  U.S. defense services were provided to modify the aircraft for major U.S. systems or sub-systems.[8]  Respondent did not obtain U.S. approval to engage in brokering activities of the U.S. systems or sub-systems as part of the proposed aircraft sale for any of the countries.

From 2005-2007, Respondent marketed the upgrade of three (3) refurbished frigates to Chile.  The frigates included U.S. defense articles.  U.S. defense services were provided to modify the frigate for major U.S. systems or sub-systems.[9]  Respondent did not obtain U.S. approval to engage in brokering activities of the U.S. systems or sub-systems as part of the proposed frigate sale to Chile.

From 1998 to 2007, Respondent engaged in brokering activities and caused others to engage in brokering activities by providing financing through payments to brokers for brokering military systems containing U.S. defense articles and modified by the provision of U.S. defense services for

---

[7] Depending upon the country, aircraft configurations included:  CAT 7000 TACAN, AN/ARN-153 TACAN, VOR/ILS & ADF, 4720 IFF, AN/ARC-182 U/VHF Transceiver, AN/ARC-210 Transceiver, AN/ARN-147 VOR/ILS, APG-66H Radar, AGM-65 Maverick ASM, AIM-9 Sidewinder AAM.

[8] Depending upon the country, aircraft configurations included:  36-150 APU, INS/GPS, AIM-120 AMRAAM, AIM-9 Sidewinder, Paveway II & Paveway IV LGBs, Harpoon ASM, and GBU-32 JDAM

[9] Depending upon the frigate, configurations included:  Mk-46 Mod5 torpedoes, Harpoon ASM, Phalanx CIWS, Bushmaster cannon.

major U.S. systems and sub-systems.  For example, information provided by the U.S. Department of Justice from its criminal investigation of Respondent indicated that Respondent made payments to two brokers associated with the frigate sales to Chile.  These brokers were Cornwall Overseas Corp. and Tasker Investments Ltd., both in the British Virgin Islands.

While the Department lacks complete details, the Department has reasonable cause to believe and to estimate that from 1998 to 2007 when the Respondent claims payments ceased, Respondent directly made no less than one hundred (100) payments to brokers from 1998 to 2007.

## *Causing Unauthorized Brokering*[10]

From 1998 to 2007, Respondent used advisers for defense transactions and proposed defense transactions involving U.S. defense articles and services without obtaining authorization from the Department.  Information available to the Department indicates that one hundred and thirty-two (132) entities received payments from Respondent through a third party for services rendered from 1995-2007.

In its disclosure of March 10, 2010, Respondent acknowledged the use of eight (8) other advisers just in negotiating the lease/sale agreements for the JAS-39 Gripen aircraft to Czech Republic and Hungary.  These included:  Alfons Mensdorff-Pouilly, Valurex, CEC, Laris Overseas, Jan Hasek, Dubovny Mlyn, Manor Holdings, and Omnipol.

In an internal company document, Respondent claimed to have three hundred (300) advisers in 1995.  During the visit by Department officials to Respondent's facilities in November 2010, the Department concluded that Respondent had an estimated 250 active and inactive advisers in 2007.

Based on the above information, the Department has a reasonable cause to believe and to estimate that Respondent had no less than three hundred (300) advisers cumulatively from 1998-2007 to which it made payments.  Although some of the advisors were likely not engaged in ITAR-

---

[10] Respondent uses the term "adviser," not broker.  Based on the service(s) rendered by an adviser, the Department views an adviser as generally analogous to a broker pursuant to 22 C.F.R. § 129.2.  Respondent informed the Department that some advisers perform services not regulated pursuant to 22 C.F.R. § 129.2.

- 9 -

controlled brokering activity, the Department concluded that other advisers were engaged in brokering activity that would have required registration and authorization pursuant to 22 C.F.R. §§ 129.3 and 129.7, respectively.

<u>Unauthorized Brokering by Red Diamond</u>

In February 1998, Respondent engaged Uniglobe Aktiengesellshaft (Uniglobe), a trust company in Vaduz, Liechtenstein, to create Red Diamond Trading Ltd., (Red Diamond), an offshore company, located in the British Virgin Islands, in order to, *inter alia*, conceal Respondent's brokering relationships. Although not a subsidiary of Respondent, Uniglobe structured Red Diamond in a manner in which Red Diamond could not act without Respondent's written agreement. Respondent was the ultimate beneficial owner of Red Diamond.

The purpose of Red Diamond was to facilitate payments to third party brokers hired by Respondent. Prior to Red Diamond's creation, Respondent was responsible for all agreements with and payments to its brokers. These brokers or advisors were in one of two categories: confidential and brass plate. Certain entities were considered "overt" and other entities were considered "covert." There were approximately 350 covert agreements with 299 brokers. Red Diamond operated with intent to circumvent the normal payments reviews and at the specific direction of the senior management of Respondent.

From 1998 until 2007 when it was dissolved by Respondent, Red Diamond engaged in unauthorized brokering activities subject to the ITAR by providing financing through payments to brokers for brokering military systems containing U.S. defense articles or military systems that were modified by the provision of U.S. defense services for major U.S. systems and sub-systems.

While the Department lacks complete details, the Department has reasonable cause to believe that during this period, Red Diamond made no fewer than one thousand (1,000) payments to unauthorized brokers on behalf of Respondent.

- 10 -

## *Undisclosed Payments under Part 130 of the ITAR*

In its disclosure of March 10, 2010, Respondent acknowledged making undisclosed payments to unauthorized brokers in association with the re-export of JAS-39 "Gripen" aircraft from Sweden to Czech Republic and Hungary. The re-exports were the subject of written approval by the Department because of U.S. defense articles incorporated in the aircraft. Respondent failed to disclose payments to the Department pursuant to 22 C.F.R. § 130.9.

The Department conducted further review of JAS-39 aircraft transactions and identified a license issued by the Department in June of 2002 to SAAB NA. The license authorized the export of $160 million worth of U.S. defense articles to support manufacture of JAS-39 aircraft.[11] The license included a negative certification pursuant to 22 C.F.R. § 130.9 on fees and commissions. The license was part of a broader transaction involving 1.6 billion BPS worth of Hawk and JAS-39 aircraft to National Defense Force - Air Force, South Africa.

Based on information obtained by the Department, Respondent or its representative Red Diamond made payments to brokers involved in securing the sale to South Africa. Respondent failed to disclose payments as required pursuant to 22 C.F.R. § 130.9.

## *Record-keeping (Respondent)*

Respondent failed to maintain records on its brokering activities, its financing of brokering activities by third parties, and its reporting responsibilities pursuant to 22 C.F.R. § 130.9. In its disclosure of March 10, 2010, Respondent acknowledged that it had not "maintained comprehensive records regarding Part 130 declarations (prior to 2007)." In correspondence dated August 9, 2010, Respondent indicated that it was "not confident that it has complete records prior to 2008."

---

[11] The aircraft were authorized for distribution (i.e., sale) to South Africa under a Warehouse & Distribution Agreement approved by the Department.

- 11 -

*Record-keeping (Red Diamond)*

On behalf of Respondent, Red Diamond failed to maintain records on its brokering activities and its financing of brokering activities by third parties.


JURISDICTION

Respondent is a public limited company organized under the laws of England and Wales.

Respondent is a foreign person within the meaning of the AECA and § 120.16 of the ITAR, and subject to the jurisdiction of the Department under the AECA and ITAR for matters identified herein.

During the period covered by the violations set forth herein, Respondent was engaged in brokering activities covered by Part 129 of the ITAR, was engaged in the payment of contributions, fees, or commissions for which it was obligated to provide the Department with information in accordance with Part 130 of the ITAR, and was involved in the manufacture, export and re-export of defense articles and defense services, and was required to be registered as a broker with the Department of State, Directorate of Defense Trade Controls ("DDTC") in accordance with section 38 of the AECA and § 129.3 of the ITAR.

The defense articles and defense services associated with the violations set forth herein are designated as controlled under various categories of the U.S. Munitions list ("USML"), § 121.1 of the ITAR.[12] These defense articles and defense services include the following items:

The JAS-39 "Gripen" aircraft is controlled under Category VIII(a) of the USML, § 121.1 of the ITAR by virtue of its incorporation of U.S. origin defense articles and the provision of defense services to modify the aircraft for major U.S. defense systems and sub-systems.

---

[12] U.S. origin defense articles and defense services are controlled under the USML regardless of location. Foreign origin defense articles are controlled under the USML when temporarily imported into the United States.

- 12 -

Engines for the Gripen aircraft are controlled under Category VIII(b) of the USML, § 121.1 of the ITAR.

Parts and components of the Gripen aircraft are controlled under Category VIII(h) of the USML, § 121.1 of the ITAR.

U.S. systems and sub-systems of the Gripen aircraft not otherwise controlled under Category VIII of the USML are controlled under other categories of the USML, § 121.1 of the ITAR (e.g., military electronics are controlled under Category XI of the USML).

The Hawk Trainer aircraft is controlled under Category VIII(a) of the USML, § 121.1 of the ITAR.

Parts and components of the Hawk aircraft are controlled under Category VIII(h) of USML, § 121.1 of the ITAR.

U.S. systems and sub-systems of the Hawk aircraft not otherwise controlled under Category VIII of the USML are controlled under other categories of the USML, § 121.1 of the ITAR (e.g., missiles are controlled under Category IV and military electronics are controlled under Category XI of the USML).

The EF-2000 Eurofighter "Typhoon" aircraft is controlled under Category VIII(a) of the USML, § 121.1 of the ITAR.

Parts and components of the Typhoon aircraft are controlled under Category VIII(h) of USML, § 121.1 of the ITAR.

U.S. systems and sub-systems of the Typhoon aircraft not otherwise controlled under Category VIII of the USML are controlled under other categories of the USML, § 121.1 of the ITAR (e.g., missiles and bombs are controlled under Category IV and military electronics are controlled under Category XI of the USML).

The Frigate Type 23 is controlled under Category VI(a) of the USML, § 121.1 of the ITAR.

- 13 -

U.S. systems and sub-systems of the Frigate Type 23 not otherwise controlled under Category VI of the USML are controlled under other categories of the USML, § 121.1 of the ITAR (e.g., missiles and torpedoes are controlled under Category IV of the USML).

## REQUIREMENTS

Part 121 of the ITAR identifies the items that are defense articles, technical data, and defense services pursuant to section 38 of the AECA.

Section 127.1(a)(1) provides that it is unlawful to re-export or re-transfer or attempt to re-export or re-transfer from one foreign destination to another foreign destination by anyone of any U.S. origin defense article for which a license or other approval is required by the ITAR without first obtaining the required license or written approval from the Directorate of Defense Trade Controls.

Section 127.1(a)(6) provides that it is unlawful to engage in the business of brokering activities for which registration, a license or written approval is required by this subchapter without first registering or obtaining the required license or written approval from the Directorate of Defense Trade Controls.

Section 127.1(d) of the ITAR provides that it is unlawful to knowingly or willfully cause, or aid, abet, counsel, demand, procure or permit the commission of any act prohibited by, or the omission of any act required by 22 U.S.C § 2778, 22 U.S.C. § 2779, or any regulation, license, approval or order issued thereunder.

Section 127.2(a) of the ITAR provides that it is unlawful to use any export or temporary import control document containing a false statement or misrepresenting or omitting a material fact for the purpose of exporting any defense article or technical data or furnishing of any defense service for which a license or approval is required by the ITAR.  Section 127.2(b) provides that export control documents include an application for permanent export license and supporting documents and any other document used in the regulation or control of a defense article or defense service for which a license or approval is required under the ITAR.

Part 129 of the ITAR identifies the requirements for registration of brokers and brokering activities that require written approval or are otherwise exempt from written approval.

Section 129.3(a) of the ITAR provides that any foreign person otherwise subject to the jurisdiction of the United States who engages in the business of brokering activities as defined in Part 129 is required to register with the Directorate of Defense Trade Controls.

Section 129.4(c) of the ITAR provides that any person registered as a broker with the Directorate of Defense Trade Controls maintain records as required under Section 122.5 of the ITAR, including records on brokering activities and information on political contributions, fees or commissions required by Part 130.

Section 129.6 of the ITAR provides that no person may engage in the business of brokering activities without the prior written approval or prior notification to the Directorate of Defense Trade Controls, unless otherwise exempt.

Section 129.9 of the ITAR provides that any person required to register under Part 129 shall provide annually a report to the Directorate of Defense Trade Controls enumerating and describing its brokering activities by quantity, type, U.S. dollar value, and purchaser(s) and recipient(s), license(s) numbers for approved activities and any exemptions utilized for other covered activities.

Section 130.9 of the ITAR provides that applicants must inform the Directorate of Defense Trade Controls as to whether the applicant or its vendors have paid or offered or agreed to pay fees or commissions in respect of any sale for which a license or approval is requested.

Section 130.12(a) provides that every applicant or supplier must obtain from each vendor, from or through whom the applicant acquired defense articles or defense services forming the whole or a part of the sale, a full disclosure by the vendor of all political contributions or fees or commissions paid, by vendor with respect to the sale.  Such disclosure must include responses to all the information pertaining to vendor required to

enable applicant or supplier, as the case may be, to comply fully with §§130.9 and 130.10.  If so required, they must include the information furnished by each vendor in providing the information specified.

Section 130.12(b) provides that any vendor which has been requested by an applicant or supplier to furnish an initial statement under paragraph (a) of this section must, except as provided in paragraph (c) of this section, furnish such statement in a timely manner and not later than 20 days after receipt of such request.

## CHARGES

### Charges [1 – 14] – Failure to Register as a Broker

Respondent violated § 129.3 of the ITAR fourteen (14) times when it failed to register as a broker with the Department from 1998 to 2011 while Respondent engaged in brokering activities.

### Charges [15 – 1144] – Failure to Obtain Written Approval for Brokering

Respondent violated § 129.6 of the ITAR one hundred and thirty (130) times when Respondent failed to obtain written approval when Respondent engaged in brokering activities – eight (8) times for the JAS-39 aircraft, thirteen (13) times for the EF-2000 aircraft, six (6) times for the Hawk aircraft, three (3) times for the Type 23 frigates, and an estimated one hundred (100) times for financing brokering by making payments to brokers from 1998 to 2007.

Red Diamond Trading Ltd., acting on behalf of and at the direction of Respondent violated § 129.6 of the ITAR an estimated one thousand (1,000) times for financing brokering by making payments to brokers from 1998 to 2007.

### Charges [1145 – 1157] – Failure to File Annual Broker Reports

Respondent violated § 129.9 of the ITAR thirteen (13) times when Respondent failed to provide an annual report of brokering activities from 1998 to 2010 when Respondent engaged in brokering activities.

- 16 -

Charges [1158 – 1457] – Causing Unauthorized Brokering

Respondent violated § 127.1(d) of the ITAR three hundred (300) times when Respondent used brokers who were not authorized to engage in brokering activities from 1998 to 2007.

Charges [1458 – 1460] – Failure to Disclose Payments

Respondent violated § 130.9 of the ITAR three (3) times when Respondent failed to disclose payments in respect of a sale for which a license or other approval was required.

Charges [1461 – 2591] – Failure to Maintain Records

Respondent violated § 129.4(c) of the ITAR one hundred and thirty-one (131) times when it failed to maintain records of brokering and financing of brokering by payments to other brokers.

Red Diamond Trading Ltd., acting on behalf of and at the direction of Respondent violated § 129.4(c) of the ITAR an estimated one thousand (1,000) times when it failed to maintain records of brokering and financing of brokering by payments to other brokers.

## ADMINISTRATIVE PROCEEDINGS

Pursuant to Part 128 of the ITAR, administrative proceedings are instituted by means of a charging letter against Respondent for the purpose of obtaining an Order imposing civil administrative sanctions.  The Order issued may include an appropriate period of debarment, which shall generally be for a period of three years, but in any event will continue until an application for reinstatement is submitted and approved.  Civil penalties, not to exceed $500,000 per violation, may be imposed as well in accordance with section 38(e) of the AECA and § 127.10 of the ITAR.

A Respondent has certain rights in such proceedings as described in Part 128 of the ITAR.  Currently, this is a proposed charging letter. However, in the event that you are served with a charging letter, you are

advised of the following matters:  You are required to answer the charging letter within 30 days after service.  If you fail to answer the charging letter, your failure to answer will be taken as an admission of the truth of the charges.  You are entitled to an oral hearing, if a written demand for one is filed with the answer, or within seven (7) days after service of the answer. You may, if so desired, be represented by counsel of your choosing.

Additionally, in the event that you are served with a charging letter, your answer, written demand for oral hearing (if any) and supporting evidence required by § 128.5(b) of the ITAR, shall be in duplicate and mailed to the administrative law judge designated by the Department to hear the case.  These documents should be mailed to the administrative law judge at the following address:  USCG, Office of Administrative Law Judges G-CJ, 2100 Second Street, SW Room 6302, Washington, D.C. 20593.  A copy shall be simultaneously mailed to the Managing Director, Directorate of Defense Trade Controls, Bureau of Political Military Affairs, U.S. Department of State, PM/DDTC, SA-1, 12th Floor, Washington, D.C. 20522-0112.  If you do not demand an oral hearing, you must transmit within seven (7) days after the service of your answer, the original or photocopies of all correspondence, papers, records, affidavits, and other documentary or written evidence having any bearing upon or connection with the matters in issue.

Please be advised also that charging letters may be amended from time to time, upon reasonable notice.  Furthermore, pursuant to § 128.11 of the ITAR, cases may be settled through consent agreements, including after service of a proposed charging letter.

Be advised that the U.S. Government is free to pursue civil, administrative, and/or criminal enforcement for violations of the AECA and the ITAR.  The Department of State's decision to pursue one type of enforcement action does not preclude it, or any other department or agency, from pursing another type of enforcement action.

Sincerely,


-------------------------------
U.S. Department of State

UNITED STATES DEPARTMENT OF STATE
BUREAU OF POLITICAL MILITARY AFFAIRS
WASHINGTON, D.C. 20520


In the Matter of:

BAE Systems plc

    A Company Organized Under the Laws of England and Wales

Respondent


## CONSENT AGREEMENT

WHEREAS, the Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, U.S. Department of State ("Department") has notified BAE Systems plc, including its businesses, units, subsidiaries (other than BAE Systems, Inc. and its subsidiaries), and operating divisions ("Respondent"), of its intent to institute an administrative proceeding pursuant to section 38 of the Arms Export Control Act, as amended ("AECA") (22 U.S.C. § 2778), and its implementing regulations, the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Parts 120-130);

WHEREAS, Respondent cooperated with the Department to address prospective concerns regarding Respondent conduct, and provided in

- 2 -

response to the direction of the Department information related to the Proposed Charging Letter and this Consent Agreement;

WHEREAS, the Department acknowledges that Respondent implemented, and continues to implement, AECA and ITAR compliance measures, including certain measures remedial to the violations contained in the Proposed Charging Letter;

WHEREAS, Respondent hereby certifies to the Department of its intent to ensure, in particular, compliance with AECA and ITAR provisions pertaining to brokering and/or the payment of fees, commissions, or contributions;

WHEREAS, the activities outlined in the Proposed Charging Letter do not relate to or represent conduct of the U.S. company BAE Systems, Inc. ("BAE, Inc."), nor any of its subsidiaries;

WHEREAS, Respondent has reviewed the Proposed Charging Letter and this Consent Agreement, fully understands these documents, and enters into this Consent Agreement voluntarily and with full knowledge of its rights and expects cooperation during the term of this Consent Agreement;

WHEREAS, Respondent wishes to settle and dispose of all potential civil charges, penalties and sanctions under the AECA and ITAR arising from the violations specified in the Proposed Charging Letter by entering into this Consent Agreement;

WHEREAS, Respondent, without admitting or denying the allegations in the Proposed Charging Letter, wishes to avoid the expense and business disruption of litigating the charges and to settle and dispose of all potential civil charges, penalties and sanctions set out in and arising from the Proposed Charging Letter by entering into this Consent Agreement;

WHEREAS, Respondent agrees that this Consent Agreement will remain in effect for a period of four (4) years, subject to the terms and conditions set forth below;

- 3 -

WHEREAS, Respondent agrees that if the Department finds that this Consent Agreement was negotiated based on Respondent's knowingly providing materially false or misleading information to the Department, the Department may revoke this Consent Agreement and the related administrative order ("Order"), and bring additional charges against Respondent.  Additionally, Respondent understands that a violation of this Consent Agreement is considered a violation of the Order; and

WHEREAS, the Department and Respondent agree to be bound by this Consent Agreement and the Order to be entered by the Assistant Secretary of State for Political-Military Affairs.

Now, WHEREFORE, the Department and Respondent agree as follows:

## Parties

(1) The Parties to this Consent Agreement are the Department and Respondent, including Respondent's businesses, units, subsidiaries, and operating divisions and their assignees and successors, except that this Consent Agreement does not apply to BAE, Inc., nor its subsidiaries as of the date of the Order, nor any subsidiaries subsequently acquired by BAE, Inc. not previously subject to the Consent Agreement.  In the event of reorganization, the terms of this agreement will follow and apply to all affected entities or units.  Respondent may assign to BAE, Inc. the roles and responsibilities of "Respondent" for any or all purposes in paragraphs 3 through 17, 24, 25, and 31 of this Consent Agreement as agreed to by the Respondent, BAE, Inc., and the Director, DTCC, regarding any or all of the foreign businesses, units, subsidiaries, and operating divisions that are managed by BAE, Inc.  As to these foreign businesses, units, subsidiaries, and operating divisions that are managed by BAE, Inc., all aspects and requirements of the Consent Agreement will be implemented in a manner consistent with their separate governance structure from Respondent.

## Jurisdiction

(2) Respondent is a foreign person within the meaning of the AECA and § 120.16 of the ITAR, and subject to the jurisdiction of the Department

- 4 -

under the AECA and ITAR for matters identified in the Proposed
Charging Letter.

## Remedial Measures

(3) Respondent, reflecting its commitment to conduct its business in full
compliance with the AECA and the ITAR, and in order to ensure, in
particular, that all transactions subject to the AECA and ITAR are
conducted transparently and without omission, has either implemented,
or will continue to implement, the following remedial measures and such
additional measures as may be mutually agreed upon by Respondent and
the Director, Office of Defense Trade Controls Compliance (DTCC),
and agrees further that these measures will remain in effect for the
duration of this Consent Agreement, subject to the terms and conditions
set forth below, as part of this Consent Agreement entered into with the
Department.

(4) Further, Respondent agrees that these measures will be applied to
any future Respondent business acquisitions that are involved in the
design, manufacture, sale, re-export, re-transfer, export, temporary
import, or brokering of ITAR-controlled defense articles, to include
technical data, and the provision of defense services within six (6)
months of the date of that acquisition.

(5) Further, if Respondent intends to sell any of its businesses, units,
subsidiaries, or operating divisions, that engage in ITAR-controlled
activities, Respondent agrees, where permitted to do so by law and
without breaching any laws or regulations of England and Wales or any
other applicable jurisdiction, to notify DTCC sixty (60) days prior to
such sale, but in any event will provide such notice at the earliest
opportunity consistent with law and regulation.  Respondent  further
agrees to notify the purchaser in writing, and to require the purchaser to
acknowledge in writing prior to the sale, that the purchaser will be bound
by the terms and conditions of this Consent Agreement.

(6)  Respondent acknowledges and accepts its obligation to continue
developing and then maintain effective defense trade control oversight,
infrastructure, policies and procedures for its AECA/ITAR-regulated
activities, during the course of and subsequent to the term of this
Consent Agreement.

- 5 -

## Official Designated for Consent Agreement Compliance and Oversight

(7) Respondent shall appoint, in consultation with and at the approval of the Director, DTCC, a qualified individual from outside Respondent to serve as a Special Compliance Official (SCO) for a term of not less than three years from the date of the Order.  The term, authorities, and responsibilities of the SCO are described below:

> (a) The SCO shall not have been employed in any prior capacity by or previously represented Respondent or any of its businesses, units, subsidiaries or affiliates, past or present, in any capacity. The Respondent shall not engage the person acting as the SCO and the Respondent shall not solicit the employment or engagement (in any capacity) of the person acting as the SCO for a period of at least five (5) years from the date of the termination of this Consent Agreement.  Respondent shall nominate a person to serve as SCO within twenty (20) days from the date of the Order, and the nomination shall be subject to the written approval of the Director, DTCC.  Within fifteen (15) days following the date of the approval of the nomination by the Director, DTCC, Respondent shall appoint the person to the position of SCO.

> (b) The term of the appointment shall not be less than thirty-six (36) months from the date of the Order.  Not less than thirty-three (33) months from the date of the Order, the Director, DTCC, shall determine, after consultation with the SCO and the Respondent, whether to extend the term of the SCO for a period of time, up to the duration of the term of the Consent Agreement.

> (c) In the event the Director, DTCC, determines not to extend the term of the SCO, or to extend for a term less than the duration of the term of the Consent Agreement, the SCO shall recommend for approval by the Director, DTCC, from within Respondent a qualified individual to serve as an Internal Special Compliance Official ("ISCO") to replace the SCO at the end of the SCO's term, and for the duration of the term of the Consent Agreement. Upon approval of the Director, DTCC, Respondent shall appoint the ISCO.  The ISCO shall be authorized to perform the

- 6 -

responsibilities of the SCO, consistent with the laws and
regulations of England and Wales.

(d) Within thirty (30) days of appointment of the SCO or ISCO,
Respondent shall provide the SCO or ISCO, respectively, with a
written statement of work approved by the Director, DTCC,
sufficient to allow him/her to perform the responsibilities
described herein and to promote Respondent's AECA and ITAR
compliance with the terms of this Consent Agreement in a manner
consistent with the purpose of this Consent Agreement and the
Order, its specific terms and conditions, and other activities
subject to the ITAR and the AECA.  The SCO will report to the
Director, DTCC, and the ISCO will report to Respondent's Chief
Executive and the Director, DTCC, as set forth herein.  The SCO
or ISCO shall perform his/her duties in consultation with DTCC.

(e) If for any reason the appointed SCO or ISCO is unable to serve
the full period of his/her appointment, or temporarily is unable to
carry out the responsibilities described herein for a period greater
than thirty (30) days, or if the Director, DTCC, decides that the
SCO or ISCO shall be removed for failure to perform his/her
duties satisfactorily, Respondent shall recommend a successor
acceptable to the Director, DTCC.

(f) Such recommendation shall be made at least thirty (30) days in
advance of a new appointment unless a shorter period is agreed to
by the Director, DTCC.  The Director, DTCC's agreement to the
replacement shall be confirmed or denied in writing to
Respondent.  In the event of denial, Respondent shall submit an
additional recommended successor in accordance with paragraphs
7(e) and 7(f).  Respondent may, at its discretion, include a
prospective alternate successor in its initial recommendation.  If a
successor SCO or ISCO is not appointed within sixty (60) days of
the termination or removal of the appointed SCO or ISCO, this
Consent Agreement will be extended for the period of time equal
to the period of time Respondent was without an approved
appointed SCO or ISCO.  Respondent will not be without an SCO
or ISCO for more than one-hundred-twenty (120) days unless the
Director, DTCC, grants an extension.

AP 050

(g) If the SCO or ISCO is for any reason unable to carry out the responsibilities described herein on a temporary basis, not to exceed thirty (30) days, then the senior official responsible for export controls within Respondent's Office of General Counsel shall assume the duties and authorities of the SCO or ISCO in the interim. The written statement of work described in paragraph (7)(d) above shall make provision for this event.

(h) The SCO or ISCO shall have three (3) principal areas of responsibility related to ITAR-controlled activities:

(1) Policy and Procedure: The SCO or ISCO shall monitor Respondent's AECA and ITAR compliance program, including, but not limited to, the remedial measures already established by the Respondent with specific attention to the following areas to the extent that they concern the AECA and ITAR activities related to them:

    i.   Policies and procedures that incorporate AECA and ITAR compliance into Respondent's senior executive level responsibilities;

   ii.   Policies and procedures for the hiring, compensation, and authorities of advisors, consultants, and brokers, and, to the extent that Respondent in the future decides to change its policies and retain agents, policies and procedure for the hiring, authorities and compensation of such agents.

  iii.   Coordination, consolidation, and standardization, where appropriate, of programs and compliance tools across Respondent's businesses, units, subsidiaries, and operating divisions;

  iv.   Meeting and maintaining adequate AECA and ITAR compliance staffing levels at or covering all businesses, units, subsidiaries, and operating divisions that involve ITAR-related activities;

v.    Policies and procedures for compliance with Parts 129 and 130 of the ITAR;

vi.   Policies and procedures for conducting internal compliance monitoring and audits;

vii.  Policies and procedures for the identification and classification of ITAR-controlled defense articles, including technical data;

viii. Policies and procedures for complying with the terms, conditions, and provisos of ITAR licenses and other ITAR approvals (*e.g.*, agreements);

ix.   Policies and procedures for preventing, detecting, and reporting AECA and ITAR violations;

x.    Policies and procedures that encourage Respondent's employees to report ITAR compliance problems through Respondent's "ethics helpline" and with the protections provided therein;

xi.   Policies and procedures for submitting voluntary disclosures to the Department of State related to ITAR-controlled activity;

xii.  Policies and procedures for tracking and ensuring the timely return to the United States of any defense articles exported temporarily;

xiii. Policies and procedures for the re-export of United States origin defense articles including technical data;

xiv.  Policies and procedures for re-transfer of United States origin defense articles including technical data;

xv.   Policies and procedures for ensuring physical security of facilities where ITAR-controlled activity occurs;

- 9 -

  xvi. Policies and procedures for the screening and control of persons who are not authorized for access to ITAR-controlled defense articles and defense services;

  xvii. Policies and procedures for maintaining appropriate ITAR records;

  xviii. Policies and procedures for shipping departments responsible for exporting, re-transferring, or re-exporting ITAR-controlled articles;

  xix. Policies and procedures for the employment of third-country foreign persons who may be engaged in ITAR-controlled activity, or have access to ITAR-controlled technical data;

  xx. Policies and procedures for tracking research and development work to ensure that all such work that involves ITAR-controlled defense articles, including technical data, and defense services is in compliance with the AECA and ITAR from inception to completion of the work; and

  xxi. Policies and procedures for ensuring that exports and re-exports of classified technical data and classified defense articles are in compliance with § 125.3 of the ITAR.

(2) Oversight:  The SCO or ISCO shall monitor, review, promote, and report on the following specific areas:

  i. Respondent's continuation of the compliance measures required by this Consent Agreement;

  ii. Respondent's corporate oversight of AECA and ITAR compliance and performance of its responsibilities under this Consent Agreement and the Order in a timely and satisfactory manner;

iii.    The continued incorporation of AECA and ITAR compliance into Respondent's senior executive level responsibilities;

iv.    Overseeing and verifying expenditures for Consent Agreement remedial compliance measures;

v.    Overseeing the improvement, coordination, consolidation, and standardization, where appropriate, of automated systems to track ITAR-controlled activities;

vi.    Reviewing and coordinating with internal ITAR audits; and

vii.    Continuation and, where necessary, implementation of additional policies and procedures that encourage Respondent's employees to report ITAR compliance problems through Respondent's "ethics helpline" and with the protections provided therein and other appropriate reporting mechanisms.

(3) Reporting:  The SCO or ISCO is responsible to the Director, DTCC, for the following reporting requirements:

i.    Tracking, evaluating and reporting on Respondent's review of ITAR violations and compliance resources;

ii.    Providing to the Director, DTCC, by 31 July and 31 January of each year during the term of the consent agreement, status reports on Respondent's ITAR compliance program, any enhancements thereto, and resource levels and their impact on or benefit to ensuring ITAR compliance;

iii.    These reports should also include information concerning Respondent's compliance with this Consent Agreement, and findings, conclusions, and any recommendations necessary to ensure compliance with the ITAR, and describe any and all instances of previous recommendations advanced by the SCO or ISCO;

- 11 -

iv. Additionally, these reports shall, in a separate annex, include any relevant comments or input by Respondent. The SCO shall provide to the Respondent a draft of his or her report at least three (3) weeks before the date of submission to DTCC in order to allow Respondent to comment thereon.  Respondent shall continue ITAR compliance oversight to ensure that best practices learned are implemented throughout all of its ITAR-regulated businesses, units, subsidiaries, and operating divisions.  Any such reports shall not affect Respondent's use of the Voluntary Disclosure procedures set forth in § 127.12 of the ITAR or Respondent's ability to gain mitigation benefits from such voluntary disclosures; and

v. Validating and providing an accounting report on remedial compliance measures to Respondent's Group General Counsel, and other senior officials as appropriate, and to the Director, DTCC, within one year from the date of the Order and then annually thereafter. Respondent shall prepare the accounting report, certified as correct by the Group Finance Director (GFD), of remedial-measure expenditures to maintain, improve or implement Respondent's compliance system.

(i) With the understanding that nothing in this paragraph shall be interpreted to compel a waiver of applicable attorney-client or work-product protections, nor require the violation of any applicable local laws and regulations including security access requirements, or Special Security Agreements entered into with the U.S. Government, the SCO or ISCO shall have full and complete access to all personnel, books, records, documents, audits, reports, facilities, and technical information relating to compliance with this Consent Agreement, including but not limited to that related to contracts, payments, and commissions, and to all ITAR munitions authorizations, licenses, and Respondent's guidance relating to the export, re-export, or re-transfer of ITAR-controlled defense articles, including technical data, and defense services.  In the event the SCO or ISCO is

denied access based on local laws and regulations, the Director, DTCC shall be notified of the denial and the reasons therefor, and all reasonable efforts shall be made to cure.

(j) Respondent's businesses, units, subsidiaries, and operating divisions shall cooperate with all reasonable requests of the SCO or ISCO, including requests for assistance to obtain necessary security clearances, and shall take no action to interfere with or impede the SCO's or ISCO's ability to monitor Respondent's compliance with this Consent Agreement, the Order, and the AECA and the ITAR, or to carry out SCO's or ISCO's other responsibilities set forth in this Consent Agreement.  If Respondent finds in any particular circumstance during the term of the Consent Agreement that Respondent cannot comply with a provision of this paragraph because of requirements under local laws and regulations or prohibitions on access to technology imposed by the U.S. or other countries, Respondent shall bring this to the attention of the Director, DTCC.  The SCO or ISCO shall notify DTCC whenever the SCO or ISCO encounters any difficulties in exercising the duties and responsibilities assigned under this Consent Agreement.

(k) The SCO or ISCO may be requested to perform additional defense trade oversight, monitoring, and coordination of activities as agreed to by Respondent and the Director, DTCC.

(l) In fulfilling the responsibilities set forth in this Consent Agreement, the SCO or ISCO may, at his/her sole discretion, present any ITAR-controlled defense trade compliance-related issue directly to any or all among Respondent's Chief Executive, General Counsel, and the Director, DTCC.

(m) The SCO or ISCO shall, with the approval of the Director, DTCC, and the concurrence of Respondent, have the authority to employ in a support capacity at the expense of Respondent, such assistants and other professional staff as are reasonably necessary to assist the SCO or ISCO to carry out his/her duties and responsibilities.

- 13 -

(n)  In the event Respondent possesses a demonstrable rationale for requesting the removal of the SCO, such information shall be provided to the Director, DTCC, along with recommendations as to a replacement, pursuant to the conditions of this paragraph (7). Any determination as to removal of the SCO shall be at the sole discretion of the Director, DTCC.

## Compliance Resources and Program Enhancements

(8) Under this Consent Agreement, Respondent shall ensure that adequate resources are and continue to be dedicated to ITAR compliance throughout Respondent's ITAR-regulated businesses, units, subsidiaries, and operating divisions.  Respondent shall continue policies and procedures, and make enhancements as required, for all Respondent employees with responsibility for AECA and ITAR compliance that address lines of authority, staffing levels, performance evaluations, career paths, promotions, and compensation.

(9) Within one-hundred twenty (120) days from the date of the Order, Respondent shall conduct an internal review throughout Respondent's businesses, units, subsidiaries, and operating divisions of AECA and ITAR compliance resources directed towards the types of violations included in the Proposed Charging Letter, to include an estimate of current numbers and types of personnel, including officers, employees, agents, advisers, and brokers, if any, engaged in covered activities. Respondent shall provide a report of these findings to the SCO and the Director, DTCC.

## Strengthened Compliance Policies, Procedures, and Training

(10) Respondent will continue existing compliance policies and procedures and within twelve (12) months from the date of the Order, Respondent will have instituted strengthened corporate export compliance procedures, as appropriate, focused principally on ensuring that Respondent's business operations address the causes of the violations included in the Proposed Charging Letter and the following after review by the SCO and a determination with the Respondent regarding the changes necessary to fulfill these objectives:

- 14 -

a) Incorporation of ITAR Parts 129 and 130 policies, procedures, and training across all relevant Respondent businesses, units, subsidiaries, and operating divisions;

b) All Respondent personnel, agents, brokers, and advisors engaged in ITAR-regulated activities are familiar with the AECA and the ITAR, and their own and Respondent's responsibilities, thereunder;

c) All persons responsible for supervising those employees, including senior managers of those businesses, units or subsidiaries, are knowledgeable about the underlying policies and principles of the AECA and the ITAR;

d) A plan for all new employees to receive basic ITAR compliance training at orientation;

e) A plan for all Respondent personnel engaged in ITAR-regulated activities to receive on-going web-based (or its equivalent) general and focused face-to-face ITAR training on at least an annual basis; and

f) Maintenance of training data indicating the names of employees, trainers (for face-to-face training), and level and area of training received.

## ITAR Compliance Tracking System

(11) In consultation with the SCO, Respondent shall review the current information technology systems for tracking ITAR-controlled activities, implement additional systems where necessary, consolidate and standardize systems where feasible across businesses, units, subsidiaries, and operating divisions, and where appropriate strengthen Respondent's internal controls for ensuring compliance with the AECA and the ITAR. Respondent will provide to the SCO a summary of activities undertaken under this paragraph for use in creation of, and possible inclusion as an Annex to, the SCO report required in paragraph 7(h)(3)(ii) above.

(12) In order to prevent unintentional or accidental transmissions to unauthorized recipients, Respondent will also provide training to all

- 15 -

employees to ensure that any type of electronic transmissions of ITAR-controlled technical data are sent in accordance with Respondent's defense trade compliance policies and procedures.

## Audits

(13) Respondent shall have outside consultants with expertise in AECA/ITAR matters, approved by the Director, DTCC, perform two (2) audits during the term of this Consent Agreement. The audits will be conducted under the supervision of the SCO or ISCO.

(14) Within six (6) months from the date of the Order, a draft audit plan for the first audit will be submitted to the Director, DTCC, for review and approval. The first audit shall provide a thorough assessment of the overall effectiveness of Respondent's AECA/ITAR compliance program throughout its businesses, units, subsidiaries, and operating divisions. This audit will be completed along with a written report containing recommendations for improvements, if any, within twelve (12) months from the date of the Order. The first such audit results and report will be submitted by Respondent to the Director, DTCC, along with Respondent's plan to address recommendations, if any. As outlined in this Consent Agreement, no attorney-client relationship is formed between the Respondent and the SCO, or the Respondent and the outside consultants with expertise in ITAR/AECA matters. Consequently, Respondent agrees that it will not assert attorney-client privilege as to the audit results and the report, and the Department agrees that the audit results and report are confidential. Nothing in this Consent Agreement shall limit the use of such results and reports in any action brought by the Department against Respondent. Nothing in this paragraph shall be interpreted as to compel a waiver of any attorney-client work product or other applicable privileges or protections.

(15) Subsequently, within thirty-six (36) months from the date of the Order, a draft audit plan for the second audit will be submitted to the Director, DTCC, for review and approval. The second audit shall verify whether Respondent addressed the compliance recommendations from the first audit report, and the effectiveness of Respondent's compliance with requirements of this Consent Agreement with focus on those actions undertaken prior to and after the date of this Consent Agreement to address the compliance issues identified in the Proposed Charging

Letter, the policies, procedures, and training established by Respondent, and such other areas as may be identified by the SCO or the Director, DTCC. Within forty-two (42) months from the date of the Order, Respondent shall have the second audit completed along with a written report containing recommendations for improvements, if any. The second audit results and report will be submitted by Respondent to the Director, DTCC. As outlined in this Consent Agreement, no attorney-client relationship is formed between the Respondent and the SCO, or between the Respondent and outside consultants with expertise in ITAR/AECA matters. Consequently, Respondent agrees that it will not assert attorney-client privilege as to the audit results and the report and the Department agrees that the audit results and report are confidential. Nothing in this Consent Agreement shall limit the use of such results and reports in any action brought by the Department against Respondent. Nothing in this paragraph shall be interpreted as to compel a waiver of any attorney-client work product or other applicable privileges or protections.

## Continued Compliance Anonymous Reporting Program

(16) Respondent will continue and publicize to its employees the availability of Respondent's programs for reporting concerns, including complaints and perceived violations involving the AECA and the ITAR through Respondents "ethics helpline" and with the protections provided therein. Once such complaints, concerns or violations about AECA or ITAR matters have been reported, Respondent will ensure that this information is forwarded to Respondent's Chief Counsel, Compliance and Regulation. The Chief Counsel, Compliance and Regulation will be responsible for resolving such matters and reporting resolutions to the SCO or ISCO. If the Respondent's Chief Counsel, Compliance and Regulation, SCO, or ISCO, is the subject of the complaint, concern or violation, the matter will be referred to Respondent's Group General Counsel for resolution and for reporting resolutions to the SCO or ISCO. If Respondent's Group General Counsel is the subject of the complaint, concern or violation, the matter will be referred to Respondent's Chief Executive for resolution and for reporting resolutions to the SCO or ISCO.

(17) The SCO or ISCO shall include in his/her report pursuant to paragraph 7(h)(3)(ii) above an assessment of the effectiveness of the

reporting program relating to export matters.  This report will be in sufficient detail such that the Department may, consistent with its responsibilities under law and regulation, form an opinion about the seriousness of the alleged violations, without limiting employee confidentiality.

## Penalty

(18) Respondent agrees that it shall pay in fines and in remedial compliance measures an aggregate civil penalty of seventy-nine million dollars ($79,000,000) in complete settlement of alleged civil violations pursuant to Section 38 of the AECA and the ITAR, as set forth in the Proposed Charging Letter.  Respondent agrees to waive its rights to raise the defense of Statute of Limitations with regard to the collection of the civil penalty imposed by this Consent Agreement, and that the Statute of Limitations shall be tolled until the last payment is made.  Respondent also agrees that such civil penalty shall be a nondischargeable debt in accordance with Section 523(a)(7) of the Federal Bankruptcy Code. The civil penalty shall be payable as follows:

   a) Sixty-nine million dollars ($69,000,000) shall be paid through several installments as follows:

      1) Eighteen million dollars ($18,000,000) is to be paid within ten (10) days from the date of the Order.

      2) Seventeen million dollars (17,000,000) is to be paid within one year from the date of the Order and then on each of the second and third anniversaries of the date of the Order.

      3) The Department and Respondent agree that no interest shall accrue or be due on the unpaid portion of the civil penalty if timely payments are made as set forth in paragraphs (18)(a)(1) and (18)(a)(2) above.

   b) The remaining penalty of ten million dollars ($10,000,000) is hereby assessed, but this amount will be suspended in accordance with the following:

1) Three million dollars ($3,000,000) will be suspended on the condition that Respondent has applied this amount to self-initiated, pre-Consent Agreement remedial compliance measures, as determined by DTCC as set forth in paragraph (18)(c) below.

2) Seven million dollars ($7,000,000) will be suspended on the condition that Respondent applies this amount to Consent Agreement authorized remedial compliance measures, determined by DTCC as set forth in paragraph (18)(c) below, over the term of this Consent Agreement for the purpose of defraying a portion of the costs associated with the remedial compliance measures specified herein.

c) In accordance with paragraph (18)(b), Respondent's GFD in consultation with the SCO, as set forth below, will conduct a review of Respondent's expenditures for remedial compliance measures, and provide the results of the review, certified as correct by the GFD, to DTCC. DTCC will respond within ninety (90) days with a determination from that review if the expenditures claimed by Respondent to date were spent for Consent Agreement-authorized remedial compliance costs. To the extent that DTCC determines that expenditures claimed or any portion thereof were utilized for Consent Agreement-authorized remedial compliance costs, that amount will be credited against the appropriate suspended penalty in sub paragraph (18)(b)(1) or (18)(b)(2). The remaining portion of the suspended penalty shall be used for additional Consent Agreement-authorized remedial compliance costs. Respondent's GFD in consultation with the SCO will provide to DTCC no later than one (1) year from the date of the Order, and then annually thereafter, for verification and approval, an itemized accounting, certified as correct by the GFD, of all Consent Agreement- authorized remedial compliance expenditures, to include those expenditures claimed against suspended penalties, showing specifics of how money was used to strengthen compliance within the terms of this Consent Agreement. Any remaining portion of the suspended penalty in paragraph (18)(b) unutilized at the conclusion of the term of

> this Consent Agreement will no longer be suspended and shall
> be paid within ten (10) days.

(19) Respondent is precluded from applying any portion of the seventy-nine million dollar ($79,000,000) penalty set forth in paragraph (18) as costs in any contract with any agency of the U.S. Government or any other contract where the result would be the application of any portion of the penalty as costs in any contract with any agency of the U.S. Government.  Respondent agrees that the GFD shall provide certification that the penalty: (a) will be treated as expressly unallowable costs under the Federal Acquisition Regulations; (b) will not be recovered or sought to be recovered as allowable costs, either directly or indirectly under any federal prime contract, grant or subcontract; and (c) will not be taken as a federal tax deduction.  In the event Respondent violates these prohibitions, the Department will deem it a "failure to apply funds appropriately for the required purpose."

(20) Any failure to apply funds appropriately for the required purpose, or to provide a satisfactory accounting shall result in a lifting of the suspension, in which case Respondent shall be required to pay within thirty (30) days to the Department the amount of the suspended portion of the penalty, less any amounts the Department deems to have been properly applied and accounted for expenditures in compliance with this Consent Agreement.

### Defense Services and Defense Articles

(21) Respondent, its subsidiaries, and other affiliates acknowledge and accept the authority of the Department to designate what is an ITAR-controlled defense article, and that the ITAR requires written authorization before such articles are exported, re-exported, or re-transferred, regardless of whether the underlying defense article is used in a commercial system or product.  Respondent further acknowledges that the Commodity Jurisdiction process, set forth in §120.4 of the ITAR, is the only official mechanism by which questions regarding jurisdiction and categorization may be addressed.

- 20 -

## Debarment

(22) Respondent has implemented certain remedial actions to address the
Department's concerns that violations not continue, and has taken steps
to improve its compliance program.  It has also undertaken to make
amends by paying a cash penalty and implementing the significant
additional remedial compliance actions specified in this Consent
Agreement.  The Department has determined to impose a statutory
debarment of BAE Systems plc pursuant to section 127.7 of the ITAR,
based on the criminal charges in the Judgment in a Criminal Case filed
on March 2, 2010, by the United States District Court for the District of
Columbia.  However, based on the foregoing and additional information
provided by Respondent, and request for reinstatement by BAE Systems
plc, the Assistant Secretary of State for Political-Military Affairs has
determined under Section 38(g)(4) of the AECA that Respondent has
taken appropriate steps to address the causes of the violations and to
mitigate law enforcement concerns.  Accordingly, BAE Systems plc
shall be reinstated. The following of Respondent's subsidiaries,
however, are placed under a policy of denial, meaning that there will be
an initial presumption of denial during the case-by-case review of all
licenses and other authorizations involving these subsidiaries: BAE
Systems CS&S International, Red Diamond Trading Ltd., and Poseidon
Trading Investments Ltd., including their divisions and business units,
and successor entities.  The Department reserves all rights to impose
additional sanctions, including debarment under the ITAR, against
Respondent, any subsidiary or other affiliate over which Respondent
exercises control, if it does not fulfill the provisions of this Consent
Agreement or is responsible for other compliance or law enforcement
issues under the AECA, or under other statutes enumerated in § 120.27
of the ITAR.

(23) Those subsidiaries under a policy of denial are prohibited from
participating directly or indirectly in the export and re-export of defense
articles, including technical data, or in the furnishing of defense services
or engaging in brokering activities, for which a license or other approval
is required, or where an exemption may be claimed, pursuant to the
ITAR unless an exception, known as a "Transaction Exception," has
been granted by the Department.  Notwithstanding the foregoing
language, all licenses, agreements, and other authorizations involving
those subsidiaries under a policy of denial issued prior to the date of

publication of the Public Notice of the policy of denial in the Federal Register are not affected and are not revoked.

## Legal Department Support

(24) Respondent's General Counsel's office shall provide support in all divisions for all matters involving the AECA and the ITAR.  This support must continue to be structured to achieve consistent application of the AECA and the ITAR by Respondent.  Additionally, Respondent's General Counsel's office shall ensure that in each business, unit, subsidiary, or operating division, appropriate legal support is made available as necessary to the principal personnel responsible for compliance with the AECA and the ITAR, and appropriate legal support is performed in each business unit with respect to such matters.

## On-site Reviews by the Department

(25) For the purpose of assessing compliance with the provisions of the AECA, the ITAR and future munitions licenses and other authorizations, Respondent agrees to arrange and facilitate, with minimum advance notice, on-site reviews by the Department while this Consent Agreement remains in effect.

## Understandings

(26) No agreement, understanding, representation, or interpretation not contained in this Consent Agreement may be used to vary or otherwise affect the terms of this Consent Agreement or the Order, when entered, nor shall this Consent Agreement serve to bind, constrain, or otherwise limit any action by any other agency or department of the United States Government with respect to the facts and circumstances addressed in the Proposed Charging Letter, nor will any such agreement, understanding, representation, or interpretation be made unless committed in writing and signed by Respondent and the Department.  Specifically, Respondent acknowledges and accepts that there is no understanding expressed or implied through this Consent Agreement with respect to a final decision by the Department of State concerning export licenses or other U.S. Government authorizations.  The Department agrees to review and take action on license applications or other requests for

- 22 -

authorization currently pending with the Department as of the Date of the Order.

(27) Respondent acknowledges the nature and seriousness of the offenses charged in the Proposed Charging Letter, including the potential risk of harm to the security and foreign policy interests of the United States. If this Consent Agreement is not approved pursuant to an Order entered by the Assistant Secretary for Political-Military Affairs, the Department and Respondent agree that they may not use this Consent Agreement or Proposed Charging Letter in any administrative or judicial proceeding, and that the Parties shall not be bound by the terms contained in this Consent Agreement.

(28) The Department agrees that, upon signing of the Order, this Consent Agreement resolves with respect to Respondent the civil penalties or administrative sanctions with respect to violations of § 38 of the AECA or the ITAR arising from facts Respondent has disclosed in writing to the Department in its Disclosure 10-0000621, or that have been identified in the Proposed Charging Letter.

(29) If any provision of this Consent Agreement is held unenforceable, then such provision will be modified to implement the Parties' intention, as allowable by applicable law.  All remaining provisions of this Consent Agreement shall remain in full force and effect.

## Waiver

(30) Respondent waives, upon the signing of the Order, all rights to seek any further steps in this matter, including an administrative hearing pursuant to Part 128 of the ITAR.  Respondent also waives any such rights with respect to any additional penalty (with the exception of any suspension or debarment action in accordance with Part 128 of the ITAR) assessed by the Director, DTCC, in connection with an alleged material violation of this Consent Agreement (any such additional penalty imposed will be limited to five million dollars ($5,000,000)) except as follows: In the event that the Director, DTCC, determines that Respondent has materially violated this Consent Agreement and imposes such additional penalty, and Respondent disputes such determination, Respondent may appeal such determination to the Assistant Secretary for Political-Military Affairs, and the decision of the Assistant Secretary for

Political-Military Affairs shall be the final determination in the matter, which may not be appealed.  Respondent also agrees that any such additional civil penalty shall be nondischargeable under Section 523(a)(7) of the Federal Bankruptcy Code.  Respondent also waives the right to contest the validity of this Consent Agreement or the Order, including in any action that may be brought for the enforcement of any civil fine, penalty or forfeiture in connection with this Consent Agreement or Order.

## Certification

(31) Three (3) months prior to the four (4) year anniversary of the date of the Order or the termination of the Consent Agreement, Respondent shall submit to the Director, DTCC, a written certification as to whether all aspects of this Consent Agreement have been implemented and Respondent's export compliance program has been assessed, and whether this export compliance program is adequate to identify, prevent, detect, correct, and report violations of the AECA and the ITAR.  The Consent Agreement shall remain in force, including beyond the four (4) year term, until such certification is submitted and the Director, DTCC, determines based on this certification and other factors that all compliance measures set forth in this Consent Agreement have been implemented, and that Respondent's ITAR compliance program appears to be adequate to identify, prevent, detect, correct, and report violations of the AECA and the ITAR.

## Documents to be made public

(32) Respondent understands that the Department will make this Consent Agreement, the Proposed Charging Letter, and the Order, when entered, available to the public.

## When Order Becomes Effective

(33) This Consent Agreement shall become binding on the Department only when the Assistant Secretary for Political-Military Affairs approves it by entering the Order, which will have the same force and effect as a decision and Order issued after a full administrative hearing on the record.

-24-

U.S. Department of State

Andrew J. Shapiro
Assistant Secretary for
Political-Military Affairs

May 16, 2011

Date


BAE Systems plc

David Parkes
Company Secretary

16 May 2011

Date

UNITED STATES DEPARTMENT OF STATE
BUREAU OF POLITICAL-MILITARY AFFAIRS
WASHINGTON, DC  20520

|  |  |
|---|---|
| In the Matter of: | ) |
|  | ) |
| BAE SYSTEMS PLC | ) |
|  | ) |
| Respondent | ) |

## ORDER

WHEREAS, the Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, United States Department of State ("Department"), has notified BAE Systems plc, including its businesses, units, subsidiaries (other than BAE Systems, Inc. and its subsidiaries), and operating divisions ("Respondent") of its intent to initiate an administrative proceeding against it pursuant to section 38 of the Arms Export Control Act, as amended, (the "AECA") (22 U.S.C. 2778), and its implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (the "ITAR");

WHEREAS, the proposed charges are based on allegations that the Respondent violated section 38 of the AECA and Parts 127, 129, and 130 of the ITAR as set forth in the Proposed Charging Letter, attached hereto and incorporated by reference herein, in connection with the unauthorized brokering of U.S. defense articles and services, failure to register as a broker, failure to file annual broker reports, causing unauthorized brokering, failure to report the payment of fees or commissions associated with defense transactions, and the failure to maintain records involving ITAR-controlled transactions;

WHEREAS, pursuant to section 128.11 of the ITAR, the Department and the Respondent have entered into a Consent Agreement (attached hereto and incorporated by reference herein), whereby the Department and the Respondent have agreed to settle this matter in accordance with the terms and conditions set forth therein;

IT IS THEREFOR ORDERED:

FIRST, that the Respondent shall pay in fines and in remedial compliance measures a civil penalty of seventy-nine million dollars ($79,000,000) comprised of the amounts and payable, as stipulated below, in complete settlement of the civil violations contained in the Department's Proposed Charging Letter and other information identified in the Consent Agreement.

SECOND, that Respondent shall pay sixty-nine million dollars ($69,000,000) of the seventy-nine million dollars ($79,000,000) through four (4) installments. Eighteen million dollars ($18,000,000) of this civil penalty shall be paid to the Department within ten (10) days of signing of the Order, and seventeen million dollars ($17,000,000) is to be paid within one year from the date of the Order and then on each of the second and third anniversaries of the date of the Order. Such payments to be made by cashiers or certified check payable to the Department of State.

THIRD, three million dollars ($3,000,000) of the seventy-nine million dollar ($79,000,000) penalty referenced above will be suspended on the condition that Respondent has applied this amount to self-initiated, pre-Consent Agreement remedial compliance measures, determined as set forth in paragraph (18)(c) of the Consent Agreement.

FOURTH, seven million dollars ($7,000,000) of the seventy-nine million dollar ($79,000,000) penalty referenced above will be suspended on the condition that Respondent applies this amount to remedial compliance measures over the four (4) year period commencing on the date of this Order for the purpose of defraying a portion of the costs associated with the remedial compliance measures specified in the Consent Agreement.

FIFTH, that any failure by the Respondent to apply suspended penalty funds appropriately for remedial compliance measures or provide satisfactory accounting shall result in the Respondent being required to pay within ten (10)

days of the conclusion of the term of the Consent Agreement to the Department the amount specified, less credit for amounts the Department deems to have been properly applied and accounted for as expenditures in compliance with the Consent Agreement.

SIXTH, the Department recognizes that the Respondent agrees to waive its rights to raise the defense of Statute of Limitations with regard to the collection of the civil penalty imposed by the Consent Agreement and this Order, and that the Statute of Limitations shall be tolled until the last payment is made and all terms of the Consent Agreement are satisfied.

SEVENTH, that the Respondent, and its assignees and successors, and in the event of reorganization all affected entities or units, shall comply with the compliance measures and its obligations under the provisions of the Consent Agreement and shall do so within the deadlines established therein.

EIGHTH, that the Proposed Charging Letter, the Consent Agreement and this Order shall be made available to the public.

This Order becomes effective on the day it is signed.

Andrew J. Shapiro
Assistant Secretary for
Political-Military Affairs
Department of State

Entered this ___16___ day of ___May___ 2011

# Exhibit G

This email is UNCLASSIFIED.

**From:** Tyler, Eva O [mailto:TylerEO@state.gov]
**Sent:** Friday, May 09, 2014 12:25 PM
**To:** Braun, Stephen S.
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

I pushed it to the assigned office today.

This email is UNCLASSIFIED.

**From:** Braun, Stephen S. [mailto:SBraun@ap.org]
**Sent:** Friday, May 09, 2014 12:01 PM
**To:** Tyler, Eva O
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

Eva—

I have the fax, thank you. Please let me know about the current status of F-2013-14315.

Thanks, Steve Braun

**From:** Tyler, Eva O [mailto:TylerEO@state.gov]
**Sent:** Friday, May 09, 2014 11:53 AM
**To:** Braun, Stephen S.
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

Please confirm receipt of the fax. Thank you

This email is UNCLASSIFIED.

**From:** Braun, Stephen S. [mailto:SBraun@ap.org]
**Sent:** Friday, May 09, 2014 11:36 AM
**To:** Tyler, Eva O
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

Eva:

My fax number is 202-496-8850.

As for F-2013-14315, Sheryl L. Walter sent me a denial of my appeal dated Sept. 19, 2013. It was accompanied by a separate note saying that they had begun processing of my request. That note was signed (no name typed out so I cannot provide the actual name) by "Requester Communications Branch, Office of Information Programs and Services, and was dated Aug. 26, 2013.

Steve Braun

**From:** Tyler, Eva O [mailto:TylerEO@state.gov]
**Sent:** Friday, May 09, 2014 11:30 AM
**To:** Braun, Stephen S.
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

You are most welcome.

Would you please provide me with a fax number, and a copy of the November 13, 2013 letter for case number F-2013-12881 will be faxed to you.  I was unable to locate a status inquiry for F-2013-14315, but will have a status inquiry initiated for you today.

Regards,


This email is UNCLASSIFIED.



**From:** Braun, Stephen S. [mailto:SBraun@ap.org]
**Sent:** Friday, May 09, 2014 11:20 AM
**To:** Tyler, Eva O
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

Eva—

Thanks for the update. I did not receive any letters for F-2013-12881. Additionally, I have heard nothing in response from State on my FOIA request F-2013-14315 (request for Sec. Clinton calendars and schedules 2009-2013) since my appeal of expedited processing was denied on September 24, 2013.

Steve Braun, AP Washington


Stephen Braun
Associated Press, Washington Bureau
1100 13th St. NW    Suite 700
Washington, DC    20005-4076
(O): 202-641-9405
(C): 202-365-2667
sbraun@ap.org

**From:** Tyler, Eva O [mailto:TylerEO@state.gov]
**Sent:** Friday, May 09, 2014 11:14 AM
**To:** Braun, Stephen S.
**Subject:** Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

Mr. Braun – Since this office did not hear any further inquiry pertaining to your appeal of the denial of expedited processing in the subject cases, it appears that you are in receipt of the Department's November 13, 2013 responses for both cases.  If you are not in receipt of those letters, please let us know and we will resend the letters.

**Status Update F-2013-12881**

Since the Department's October 31, 2013 letter, recently received records from the Bureau of Political-Military Affairs are going through the concurrence process.  This office has followed up with the Office of the Executive Secretariat and the Office of the Legal Adviser, but those request for records are still pending.  Therefore, at this time the estimated completion date is August 2014.

**Status Update F-2013-14267**

The request for records from the Department's Central Foreign Policy files resulted in the retrieval of a number of records which are currently under relevancy review. The request for records is still pending with the Senior Executive Service; and the assigned Compliance and Research is continuing to follow up with that office.  At this time the estimated completion date is September 2014.


Regards,


This email is UNCLASSIFIED.



The information contained in this communication is intended for the use
of the designated recipients named above. If the reader of this
communication is not the intended recipient, you are hereby notified
that you have received this communication in error, and that any review,
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
notify The Associated Press immediately by telephone at +1-212-621-1898
and delete this email. Thank you.
[IP_US_DISC]


msk dccc60c6d2c3a6438f0cf467d9a4938

# Exhibit H

AP 076

## Burns, Robert

| | |
|---|---|
| **From:** | Burns, Robert |
| **Sent:** | Wednesday, September 24, 2014 3:10 PM |
| **To:** | Burns, Robert |
| **Subject:** | Fwd: Freedom of Information Act Request F-2010-01376 (Requester: Robert Burns) - STATUS UPDATE |

Sent from my iPhone

Begin forwarded message:

> **From:** "Ross, Lela H" <RossLH@state.gov>
> **Date:** September 18, 2014 at 5:02:05 PM EDT
> **To:** "bburns@ap.org" <bburns@ap.org>
> **Subject: Freedom of Information Act Request F-2010-01376 (Requester: Robert Burns) - STATUS UPDATE**

September 18, 2014

FOIA Request Number: F-2010-01376

Dear Robert Burns:

The Office of Information Programs and Services ("IPS") is in the process of reviewing open Freedom of Information Act ("FOIA") requests and would like to provide you with the status of your case. Your case has been initiated and is pending a response.

The State Department's mission is global in nature and in turn the records that document our mission are global in nature too. The Department maintains its records both domestically and at hundreds of posts located around the world. Moreover, many of the Department's records contain national security information and are classified pursuant to executive order or other sensitive information that is exempt from release under the FOIA. All of these factors combine to make for a complex and lengthy administrative FOIA process. We sincerely regret the delay in processing your request and are providing you with this status update to keep you informed about your case. IPS receives, on average, more than 17,000 FOIA requests each fiscal year and works very hard to respond to all requests in as timely a manner as possible.

In an effort to better manage our workload, we would like additional information from you as to whether you would like to narrow the scope of your request to hasten processing or if circumstances have changed and you are no longer interested in pursuing your request. We would greatly appreciate it if you would contact the Department by responding to this e-mail, or by fax or letter, confirming how you would like us to proceed with the processing of your request. If for some reason you open this email more than 15 calendar days after its date and do not want your request to be administratively closed, please contact us to discuss whether you would like it reinstated in its original place in our queue.

1

# Exhibit I

**From:** FOIA Status [mailto:FOIAStatus@state.gov]
**Sent:** Friday, December 05, 2014 1:03 PM
**To:** Braun, Stephen S.
**Subject:** FW: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267

Dear Stephen Braun,

This is in reference to your e-mail dated December 4, 2014 addressed to Sheryl L. Walter inquiring about the status of the two FOIA requests F-2013-12881 and F-2013-14267 and the status of other request(s) mentioned in your attachment. Please be advised that Sheryl L. Walter is no longer with the agency and that John F. Hackett is currently the Acting Director, Office of Information Programs and Services (IPS).

Case F-2013-12881 – Search was initiated with the Bureau of Political Military Affairs. That search has been completed and in the review process. The estimated completion date for this request was December 2014. Our office has contacted the case officer to confirm this date. Information will be provided to you as soon as it becomes available.

Case F-2013-14267 – A search was initiated in the Department's Central Foreign Policy files and with the Senior Executive Service. The Central Foreign Policy records are under review and the search of the Senior Executive Service records is continuing. The estimated completion date for this request is April 2015.

Case F-2010-01376 – Our office has contacted the office that is processing this request. Information regarding the status will be provided to you when we receive a response.

Case F-2013-14315 -  December 2014 was the estimated completion date for your request. Our office has contacted the appropriate office to confirm this date. Information will be provided to you as soon as we receive a response.

Case F-2013-12897 – Closed in our system on August 9, 2014. The requester (Jack Gillum) was provided with information in a telephone conversation with the case officer and was satisfied. The requester withdrew this request.

Case F-2013-14260 – A search of records has been initiated with the Senior Executive Service and that search is continuing. The estimated completion date is October 2015.

Case F-2013-14257 – A search of records has been initiated with the Senior Executive Services. That search has been completed and being prepared for review. The estimated completion date for this request is April 2015.

If you have any questions regarding the status of these requests, please contact the FOIA Requester Service Center on 202-261-8484 and refer to the specific case number.

We appreciate your continued patience during the processing of these requests.

Sincerely,


Charlotte W. Duckett
U.S. Department of State


**From:** Braun, Stephen S.
**Sent:** Thursday, December 4, 2014 11:58 AM
**To:** Tyler, Eva O
**Subject:** RE: Status Updates for FOIA Case numbers F-2013-12881 & F-2013-14267


Dear Ms. Tyler:

On behalf of the Associated Press, I am forwarding an attached letter to Office of Programs and Services Director Sheryl L. Walter and to you pertaining to seven AP FOIA requests that remain uncompleted for more than a year. I am asking for a detailed response on each of these requests from State by next Wednesday. I am requesting that State provide AP with realistic dates when we should expect completion as well as explanations where State is with each of these FOIAs and what remains to be done to reach completion.

Please forward this note to Ms. Walter.

I hope to hear from Ms. Walter or you as soon as possible.

Thank you,

Stephen Braun
AP Washington



Stephen Braun
Associated Press, Washington Bureau
1100 13th St. NW   Suite 700
Washington, DC   20005-4076
(O): 202-641-9405
(C): 202-365-2667
sbraun@ap.org

# Exhibit J



**ASSOCIATED PRESS**

Brian Barrett
Corporate Counsel

450 West 33rd Street
New York, NY 10001
T 212.621.7547

www.ap.org

January 12, 2015

**VIA FEDERAL EXPRESS**
Chairman, Appeals Review Panel
c/o Information and Privacy Coordinator/Appeals Officer
U.S. Department of State
A/GIS/IPS/PP. SA-2
Washington, DC
20522-8100

Re:   **Appeal from Constructive Denial of FOIA Requests Nos. F-2013-12881; F-2013-14315; F-2013-14267; F-2013-14260; F-2013-14257 and F-2010-01376**

To Whom It May Concern:

As counsel for The Associated Press ("AP"), I am writing on behalf of AP reporters Stephen Braun, Jack Gillum and Robert Burns to appeal the U.S. Department of State's failure to respond to six separate requests for documents made pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

I.   **Background**

By e-mail and on various dates, the AP submitted six separate FOIA requests (the "Requests") to the State Department seeking documents pertaining to the decision-making and actions of former Secretary of State Hillary Rodham Clinton and her aides during her tenure at State between January 2009 and February 2013.

The AP requests sought materials within the following categories:

1) Emails and documents from former Sec. Clinton and other State officials pertaining to the department's dealings with defense contractor BAE between Jan. 21, 2009 and Dec. 31, 2011. (Filed July 29, 2013, request No. F-2013-12881; expedited processing denied; partial response of 10 pages of Congressional correspondence; estimated full completion date provided to AP by State FOIA officials was August, 2013, then pushed back to December, 2014) (Exhibit A)

2) Copies of former Sec. Clinton's complete calendars and schedules between January, 2009 and February, 2013. (Filed August 20, 2013, request No. F-2013-14315; expedited processing denied; estimated completion date was December, 2014) (Exhibit B)

1

AP 082

3) Copies of materials from former Sec. Clinton and other State officials pertaining to the designation of Special Government Employee given to former Clinton Chief of Staff Huma Abedin. (Filed August 20, 2013, request No. F-2013-14267; expedited processing denied; estimated completion date was September, 2014 and has now been pushed back to April, 2015) (Exhibit C)

4) Copies of former Sec. Clinton's emails between Jan. 20, 2009 and Feb. 1, 2013 pertaining to the terms bin Laden, Abbottabad and Seal Team 6. (Filed August 20, 2013, request No. F-2013-14260; expedited processing denied; estimated completion date October, 2015) (Exhibit D)

5) Copies of former Sec. Clinton's emails between Jan. 20, 2009 and Feb. 1, 2013 pertaining to the terms drone, metadata, pinwheel, stellarwind, blarney and FISA. (Filed August 20, 2013; F-2013-14257; expedited processing denied; estimated completion date is April, 2015) (Exhibit E)

6) Copies of former Sec. Clinton's daily calendar of appointments, calls and meetings between January 29, 2009 and March 9, 2010. (Filed March 9, 2010; F-2010-1376; expedited processing denied; no estimated completion date) (Exhibit F)

Mr. Braun, Mr. Gillum and Mr. Burns have contacted State on several occasions about these requests, but to date have received only a partial 10-page response to request No. 1 and no response to the remaining requests.

## II.  State's Failure to Respond to the Requests Within the Time Period Required by FOIA Constitutes a Constructive Denial of the Request.

State was required to respond to the AP's requests for records within 20 working days. *See* 5 U.S.C. § 552(a)(6)(A)(i). State's responses to the Requests were thus due on or about, respectively: March 30, 2010, August 26, 2013 and September 17, 2013. It is now January, 2014, nearly five years since the oldest FOIA request was filed and more than a year since the remaining requests were filed.

State has provided only a partial (and wholly inadequate) response to request No. 1 and no response at all to the other AP FOIA requests. We have received no explanation for the delay except for State's well-known backlog of FOIA cases; indeed, it is quite possible that State has failed even to begin its search for other responsive documents.

AP sent a detailed inquiry about the lack of progress to State on December 4, 2014. State official Charlotte W. Duckett responded the next day with new estimated completion dates for five of the requests – for Requests 1 and 2, Duckett estimated completion in December 2014; for Requests 3 and 5, he extended the expected response dates to April 2015. (Exhibit G)

AP 083

Of course, it is now January 2015 and State did not deliver responses for either of the estimated December completions it cited to AP. State's repeated failure to meet its own completion estimates _ along with its other failures to respond and the lengthy duration of its processing _ forces AP to mount appeals for all of these FOIA requests on the grounds of constructive denial.

State's failure to respond to the requests promptly and/or completely within the time period required by the FOIA therefore serves as a constructive denial of the request, and AP is deemed to have exhausted its administrative remedies. *See* 5 U.S.C. § 552(a)(6)(C)(i) ("Any person making a request to any agency for records . . . shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph.").

### III.   Disclosure of the Documents Sought by the Requests is in the Public Interest.

President Obama's January 21, 2009, "Memorandum for the Heads of Executive Departments and Agencies concerning the Freedom of Information Act" advises that executive agencies responding to FOIA requests "should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public." FOIA is to be administered "with a clear presumption: In the face of doubt, openness prevails." The Government should not refuse disclosure "merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears."

The Associated Press, too, is a servant of the public. "In the First Amendment, the Founding Fathers gave the press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) (noting the duty of the press to "bare the secrets of government and inform the people"); *see also Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936) ("A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.").

Here, the AP seeks information concerning former Sec. Hillary Rodham Clinton's decision-making and actions during her tenure at the State Department and the actions of a number of her aides pertaining to important governmental and national security decisions.  The information sought by the AP concerns the basic functioning of our government and the decision-making of senior officials that, if properly and expeditiously disclosed and analyzed, would help the American public better understand "what their government is up to," which takes on particular importance in light of the upcoming 2016 presidential election that in all likelihood will involve former Secretary Clinton. Disclosure of this information is plainly in the public interest. *See, e.g., Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 773-74 (1989) (finding public interest in disclosure of information that "sheds light on an agency's performance of its statutory duties"; basic purpose of FOIA "to open agency action to the light of public scrutiny" so the public can "know what their government is up to"); *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("The basic purpose of FOIA is to ensure

3

an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").

## IV.    **Request for Relief**

For the foregoing reasons, we respectfully submit that State failed to meet its legal obligations to provide the records or cite a valid reason for withholding the records. We trust that you will reverse the denial of disclosure and grant AP's request in full.

We advise you that this information is sought in connection with AP's news reporting, and is needed to timely inform the public about activities of the federal government. Therefore, we respectfully request expedited treatment of this appeal. In any event, we trust that we will receive your decision within 20 business days, as required by statute. *See* 5 U.S.C. § 552(a)(6)(A)(ii). If you have any questions about this appeal, please contact me by telephone (212-621-7547) or email (bbarrett@ap.org), rather than relying upon regular mail.

Thank you for your prompt attention to this matter.

Respectfully submitted,

Brian Barrett

Enclosures


cc:    John F. Hackett
       Acting Director, Office of Information Programs and Services
       U.S. Department of State
       Building SA-2
       515 22nd Street, NW
       Washington DC  20522-8100

       Stephen Braun, Jack Gillum and Robert Burns
       The Associated Press

4

# Exhibit K

AP 086



United States Department of State

Washington, D.C. 20520

January 16, 2015

Brian Barrett, Esq.
Associated Press
450 West 33rd Street
New York, NY 10001

Dear Mr. Barrett:

Thank you for your letter of January 12, 2015, concerning the following Freedom of Information Act ("FOIA") requests: F-2013-12881, F-2013-14315, F-2013-14267, F-2013-14260, F-2013-14257 and F-2010-01376.  You note that the Department of State has not yet fully responded to your FOIA requests.

Your FOIA requests are not subject to administrative appeal at this time, since no specific material has been denied in response to the requests.  Section (a)(6)(C) of the FOIA provides that a requester shall be deemed to have exhausted his administrative remedies if an agency fails to respond within the applicable time limit specified in the paragraph, which is twenty days (with certain exceptions).  The requester, therefore, would not be required to appeal administratively before instituting suit in federal court.  This provision does not, however, provide a basis for an administrative appeal of a request that is still being processed.  Moreover, the lack of a substantive response to date is not the same as a response indicating that no documents were found.

I have confirmed that your requests are being processed.  The Department receives thousands of FOIA and Privacy Act requests each year and yours will be processed in turn.  I have sent a copy of your letter to the offices that has been assigned responsibility for processing your requests.  Your continued patience is appreciated.  If you need further assistance, you may contact the FOIA Requester Service Center at (202) 261-8484 or FOIAstatus@state.gov.

Sincerely,

Lori Hartmann
Appeals Officer
Office of Information Programs and Services